# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

                Plaintiff-Appellee,

v

WOODIE CARL LEWIS, JR.,

                Defendant-Appellant.

UNPUBLISHED
September 10, 2015

No.   321120
Midland Circuit Court
LC No.   13-005398-FC

---

Before:  BORRELLO, P.J., and HOEKSTRA and O'CONNELL, JJ.

PER CURIAM.

A jury convicted defendant of first-degree home invasion, MCL 750.110a(2), unlawful imprisonment, MCL 750.349b, felonious assault, MCL 750.82, and possession of a firearm during commission of a felony (felony-firearm), MCL 750.227b.  The jury acquitted defendant of one count of kidnapping, MCL 750.349, and one count of assault with intent to commit criminal sexual conduct involving penetration, MCL 750.520g(1).  Defendant was sentenced as a habitual offender, fourth offense, MCL 769.12, to a prison term of 190 months to 25 years' for first-degree home invasion, 100 months to 25 years' for unlawful imprisonment, 46 months to 15 years' for felonious assault, and 2 years' for felony-firearm.  The sentences for unlawful imprisonment and felonious assault were to run concurrent to each other and consecutive to the sentence for first-degree home invasion.  All three of these sentences were to run consecutive to the felony-firearm sentence.  Defendant appeals his convictions and sentences as of right.  For the reasons set forth in this opinion, we affirm defendant's convictions and remand for amendment of the judgment of sentence.

## I.  FACTUAL BACKGROUND

The victim met defendant in August 2012 on Christian Mingle, an online dating website. The two began to date near the end of September 2012.  Two months later, the victim accepted defendant's marriage proposal.  Defendant began living with the victim's parents in Midland shortly thereafter.  The victim testified that her relationship with defendant began to deteriorate in January 2013 when she learned that defendant used his Bridge Card to purchase food for an alleged business that he had, used the victim's debit card without her permission, lied to her about owning a vehicle, and lied to her about kidney dialysis treatments.  The victim terminated the relationship on February 2, 2013.

-1-

Nonetheless, defendant appeared at the victim's residence on Valentine's Day 2013. He informed the victim that he was about to receive a kidney transplant in Detroit and that he needed a ride for the operation. Feeling sympathy for defendant's medical condition, the victim agreed to drive him to Detroit for the operation. On the way to the hospital, the plans changed. Defendant suddenly learned that the kidney he was about to receive had "died." Defendant admitted at trial that he lied about the kidney transplant. Thereafter, the victim's distrust of him turned to fear.

On March 2013, defendant appeared at the victim's residence after midnight ostensibly to drop off some of her possessions, but the victim refused to answer the door. The next day, the victim obtained a personal protection order (PPO).

Defendant testified that he and a friend came to Midland on April 9, 2013 and went to the Soaring Eagle Casino. Defendant testified that he took a cab part of the way to the victim's home, and then "stumble[d] and walk[ed]" the rest of the way. Defendant acknowledged that he had pepper spray in his pocket at the time. He testified that he arrived at the victim's house around 5:00 p.m., but the victim was not there. Defendant explained that it was "raining" and "freezing" so he made a "bad judgment call" and went inside with a key that he had from when the two were dating. However, police testified that they discovered a broken window at the residence. Once inside, defendant stated that he let the victim's dog out and did not let it back in. He stated that he fell asleep on one of the victim's chairs and was awakened when he heard the victim enter the home.

The victim testified that she worked at a pregnancy center on April 9, 2013, and then had dinner with a friend before returning home around 9:30 p.m. She stated that when she arrived home she saw her dog outside, which was unusual. The victim testified that she unlocked her door and when she walked into the kitchen, defendant was hiding behind the wall. The victim stated that defendant "jumped out and he pepper sprayed me in the face and he tackled me into the bathroom." The victim explained that defendant took her cellular telephone and told her, "stop fighting me. I have two pistols on me." At trial, defendant denied that he had a pistol with him that evening. The victim testified that defendant told her that she "had forced him into this" because "he had to do this in order to be able to talk to me." The victim stated that defendant made her sit on the futon and told her that he was going to make her watch him commit suicide.

The victim stated at one point defendant led her to the master bedroom. She testified that defendant got a shotgun she had purchased after having the PPO issued and "racked" the gun in front of her. Defendant then put the victim's hands behind her back and duct taped her wrists. While in the bedroom, defendant put the gun under his chin and threatened to shoot himself while ranting about their relationship before taking the victim back to the living room. Defendant continued to put the shotgun to his chin or in his mouth. He stated that his original plan was to take the victim and have "a lot of sex" in order "to make sure that [she gets] pregnant with [his] child" so that she would have to see him in the face of the child every day and suffer.

At some point, the victim managed to pull her hand out of her coat sleeves and slip out of the duct tape, but defendant noticed and taped her again around the torso to constrict her arms. Despite the tape, the victim was able to maneuver between defendant and the door and she ran outside and screamed while releasing herself from the duct tape as she had before. Defendant

-2-

followed, tackled the victim, and put his hand over her face. The victim testified that she was able to convince defendant to let her get into her vehicle where another struggle ensued. She attempted to honk the horn, start the vehicle, and put it in reverse. Defendant tried to stop the victim and at one point he bit her arm. Candace Haught, who lived a few houses down from the victim's residence, testified that she heard a horn honking after 12 a.m. that evening. Defendant eventually gave up and the victim drove to her friend's home six or seven miles down the road.

Chris Coughlin testified that the victim came to his house early on April 10, 2013, and she was "somewhat of a basket case." Coughlin stated that the victim said "he attacked me," and when Coughlin asked who, the victim said it was defendant and that he also had a shotgun and a handgun. Coughlin testified that he noticed that the victim was wrapped in duct tape and had head injuries. Coughlin called 911 and sheriff's deputies arrived shortly thereafter.

After the victim fled in her vehicle, defendant hid in the woods and waited for police. Early the next morning, he walked to a local elementary school where he had school employees call public transit to come pick him up. A sheriff's deputy later located defendant sleeping in the break room at a local Dollar General store. The deputy discovered a can of pepper spray in the wastebasket in a restroom at the Dollar General.

Pursuant to a pretrial ruling, the prosecution called defendant's ex-wife Kimberly Welch to testify regarding defendant's assaultive behavior during the marriage. The trial court admitted the evidence under MRE 404(b) to show that defendant "used a plan, system, or characteristic scheme that he had used before or since." Welch had flown in from Alabama to testify and was scheduled to return home the next day. As she began to testify, defendant indicated something was wrong with his heart. The trial court explained that defendant had experienced visible bleeding from his dialysis port and had been removed from the courtroom by paramedics. The trial court made a special record to determine if defendant had caused his own injury.

The first witness the prosecution called for purposes of the special record was Melanie Keckeissen, a friend of the victim. Keckeissen testified that she had been in the courtroom the prior two days, sitting in the second row near the center. Keckeissen testified that she observed defendant's right hand fidgeting with his dialysis port. She stated that she observed defendant fidget with the port more than once and at the time of the in-court incident, she stated, defendant's "arm bent it."

Katie King testified by telephone that she is a registered nurse and owner of People Network, which "is the contract medical for Midland County Jail." King explained that she treated defendant while he was in jail. King stated that defendant's dialysis port is attached to his body with sutures. King opined that if there was bleeding in the area when defendant was not receiving a dialysis treatment it would be due to trauma in the area. King stated that in the past defendant had tried to manipulate his port to cause damage on over five occasions.

Following Keckeissen's and King's testimony, the trial court found that defendant intentionally delayed the proceedings and therefore Welch would continue to testify in defendant's absence.

Welch testified that a friend set her and defendant up on a blind date in Florence, Alabama in December of 2007. Welch testified that defendant was a disc jockey at the time and that she knew him by his radio name, "Diesel." Welch stated that defendant began coming to her church and moved in with her in January 2008. Welch stated that defendant eventually proposed to her in front of their entire church congregation and they were married on March 28, 2008.

Welch testified that early in the marriage one of her nieces stated that defendant hit her and because of this, her nieces were removed from the home. Welch testified that she and defendant began to fight a lot, including one big one in July 2008. Welch testified that during this fight, defendant held her down on the bed and threw her against the wall. Welch stated that she left the day after that fight, moved in with her boss, filed for divorce, and obtained a PPO. Welch testified that she eventually had to move out of her boss's house because defendant found out where she lived and her boss no longer felt safe.

Welch stated that in November 2008, she moved into an apartment. Welch testified that in January 2009, she was at the apartment with a male friend and heard knocking at the door. Welch stated that a man claiming to be from the apartment staff stated that he needed to look at the thermostat; the man asked her male friend to go to his car and get tools. Welch testified that as soon as her friend left, defendant broke through the door and chased her. Welch stated that defendant held her down and told her that God wanted them together. She stated that defendant took her to the bathroom where she became trapped before the police came. Defendant was convicted and sentenced as set forth above and he appeals as of right.

## II. ANALYSIS

### A. OTHER-ACTS EVIDENCE

Defendant argues that the trial court erred in admitting Welch's testimony under MRE 404(b).

We review a trial court's decision to admit evidence for an abuse of discretion. *People v Katt*, 468 Mich 272, 278; 662 NW2d 12 (2003). "An abuse of discretion occurs when the court chooses an outcome outside the range of reasonable and principled outcomes." *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008). However, whether admissibility is precluded by a rule of evidence involves an underlying question of law that we review de novo. *People v McDaniel*, 469 Mich 409, 412; 670 NW2d 659 (2003).

Under MRE 404(b), evidence of a defendant's crimes, wrongs, or other bad acts is inadmissible to show a defendant's criminal propensity; however, the evidence may be admissible for other purposes such as to show that defendant acted according to a common plan, scheme or system. *People v Mardlin*, 487 Mich 609, 614; 790 NW2d 607 (2010). The test for admissibility under MRE 404(b) is: (1) the evidence must be offered for a proper purpose under MRE 404(b); (2) the evidence must be relevant under MRE 402; and (3) the probative value of the evidence must not be substantially outweighed by unfair prejudice under MRE 403. *People v VanderVliet*, 444 Mich 52, 55; 508 NW2d 114 (1993).

Moreover, while neither party makes mention of MCL 768.27b, this statute explicitly allows prior acts evidence in domestic violence cases to be admitted for propensity purposes. *People v Railer*, 288 Mich 213, 219-220; 792 NW2d 776 (2010). Section (1) provides that "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other acts of domestic violence is admissible for any purpose for which it is relevant, if it is not otherwise excluded under [MRE] 403." The Legislature defined "offense involving domestic violence" as including "[p]lacing a family or household member in fear of physical or mental harm." MCL 768.27b(5)(a)(*ii*). "[F]amily or household member" includes both a "former spouse" and "[a]n individual with whom the person has or has had a dating relationship." MCL 768.27b(5)(b)(*i*) and (5)(b)(*iv*). Our Supreme Court has held that MCL 768.27b prevails over MRE 404(b) and that evidence admitted under MCL 768.27b is to have its propensity nature weighed in favor of its probative value rather than as having a prejudicial effect. *People v Watkins*, 491 Mich 450, 455; 818 NW2d 296 (2012).

In this case, Welch's testimony concerned three prior bad acts: (1) a prior assault during the couple's marriage; (2) a prior occasion where defendant hit Welch's niece; (3) a prior incident after the marriage where defendant broke into Welch's apartment and assaulted Welch. Welch's testimony about the incident involving her niece was wholly dissimilar to the alleged misconduct in this case and was not relevant to show that defendant acted to a common plan or scheme. Furthermore, given the dissimilarities, the probative value of this evidence was outweighed by its potential for unfair prejudice under MRE 403 and the trial court erred in admitting the evidence under either MRE 404(b) or MCL 768.27b. However, as discussed below, the error does not warrant reversal.

With respect to the evidence concerning defendant's prior assaults against Welch, this testimony was admissible under MCL 768.27b because it was relevant and was not excludable under MRE 403. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403. Here, defendant's defense involved his assertion that he did not intend to commit a crime and that the events of April 9 and 10, 2013 were simply a misunderstanding. Welch's testimony was probative in rebutting that defense. Additionally, to the extent the question is close, the trial court did not abuse its discretion in admitting the evidence. See *People v Smith*, 456 Mich 543, 550; 581 NW2d 564 (1998) (stating that "[c]lose questions arising from the trial court's exercise of discretion on an evidentiary issue should not be reversed simply because the reviewing court would have ruled differently").

Moreover, even if the trial court erred in admitting Welch's testimony, reversal is not warranted. A preserved evidentiary error is not a ground for reversal unless "after an examination of the entire cause, it shall affirmatively appear that it is more probable than not that the error was outcome determinative." *People v Lukity*, 460 Mich 484, 496; 596 NW2d 607 (1999) (citation and quotation omitted). Here, apart from the other-acts evidence, there was a substantial amount of evidence establishing defendant's guilt. Specifically, the victim offered detailed testimony regarding how defendant assaulted her and a sheriff's deputy and neighbors offered testimony that corroborated the victim's description of the events that transpired on the night of the offense. Of particular note, a neighbor testified that she heard a car horn honk at about midnight on the night of the assault and Coughlin testified that the victim appeared at his

residence late that night visibly upset with duct tape around her body and stating that defendant had a gun.  In addition, police discovered a broken window at the victim's home, a can of pepper spray in the building where defendant was located, and a live ammunition round in defendant's jacket pocket, all of which further bolstered the victim's version of events.  Evidence also showed that defendant fled the scene after the victim escaped, which tended to show consciousness of guilt.  See e.g. *People v Smelley*, 485 Mich 1023, 1024; 776 NW2d 310 (2010) ("It is well established that evidence of flight is admissible to support an inference of . . . consciousness of guilt.")  In short, the prosecution introduced a substantial amount of evidence of defendant's guilt such that defendant cannot show that it is more probable than not that admission of the other-acts evidence was outcome determinative.  *Lukity*, 460 Mich at 496.

## B.  SENTENCING

Defendant was charged with felony-firearm in connection with the unlawful imprisonment, kidnapping, and assault with intent to commit sexual conduct offenses, the latter two of which he was acquitted.  Defendant argues that the trial court erred in ordering his sentence for felonious assault to be served consecutive to his felony-firearm sentence, and erred in ordering his home invasion sentence to be served consecutive to his other three sentences.

We review the imposition of consecutive sentences for an abuse of discretion.  *People v Ryan*, 295 Mich App 388, 409; 819 NW2d 55 (2012).

The first-degree home invasion statute states that a "court may order a term of imprisonment imposed for home invasion in the first degree to be served consecutively to any term of imprisonment imposed for any other criminal offense arising from the same transaction." MCL 750.110a(8).  Here, the other three offenses clearly arose out of the same transaction as the first-degree home invasion.  Given the nature of the offenses and the trial court's broad discretion with respect to sentencing, we cannot conclude that imposing consecutive sentences fell outside the range of reasonable and principled outcomes.  *Unger*, 278 Mich App at 217.

However, with respect to defendant's sentence for felonious assault, unlike home invasion, the felonious assault statute does not grant discretion to impose a consecutive sentence and felonious assault was not one of the predicate offenses that the prosecution listed on the amended information.  Accordingly, remand for amendment of the judgment of sentence to reflect that the felony-firearm sentence runs concurrent to the felonious assault sentence is appropriate.  See *People v Clark*, 463 Mich 459, 463; 619 NW2d 538 (2000).

## C.  CONFRONTATION CLAUSE

Finally, in a Standard 4 brief, defendant argues that the trial court violated his right of confrontation when it permitted Welch to offer testimony when he was absent from the courtroom.  Defendant contends that King and the prosecutor made false statements regarding his dialysis care.  However, contrary to defendant's assertion, neither King nor the prosecutor ever asserted that King gave defendant dialysis care.  What King did testify to was that as a nurse who provided medical care to defendant during his time at the Midland County Jail, she was aware of several past instances in which defendant had tampered with his dialysis port that necessitated his transport outside of the jail.  Defendant also asserts that King's testimony that he

was hospitalized for tampering with his dialysis catheter is contradicted by medical records. However, no medical records are in the lower court record to confirm or deny defendant's assertion. In any event, a witness testified to seeing defendant's hand near his port during trial.

A defendant forfeits his right of confrontation when he is removed for his own disruptive behavior. *People v Staffney*, 187 Mich App 660, 664; 468 NW2d 238 (1990), citing *Illinois v Allen*, 397 US 337, 338; 90 S Ct 1057; 25 L Ed 2d 353 (1970). In this case, the trial court considered the evidence and found that defendant engaged in disruptive behavior. Given the record before this Court, we cannot find that the trial court clearly erred in making this determination. See e.g. *People v Farrow*, 461 Mich 202, 208; 600 NW2d 634 (1999) (noting that a reviewing court must give deference to a trial court's determinations with respect to the credibility of witnesses). Accordingly, defendant was not denied his right of confrontation.

Affirmed and remanded for correction of the judgment of sentence.


/s/ Stephen L. Borrello
/s/ Joel P. Hoekstra
/s/ Peter D. O'Connell